Thank you, your honors, and may it please the court. Before I dive into the legal issues here, I just want to give the court the context behind my client's decision to speak to James Berkley. Before you dive into that, can you tell me you have a final judgment here? A final judgment as far as granting the summary judgment? Yes. Well, I'm looking at a document which talks about the consent motion for entry of final judgment and seeks to preserve two claims for the future. We generally don't regard those as final judgments. But I think that those were reserved by the district court for the specific reason that we could take the final judgment in this case. That was negotiated by the parties. Well, that might be so, but there's a fair amount of case law. If you want to waive or the plaintiff wants to waive or the parties want to waive those additional claims right now in front of us, okay. Otherwise, the whole purpose of doing that is to elude the statute of limitations, and we don't generally allow people to do that. In other words, you can't take five claims and leave two to be litigated later unless you get some sort of, you know, if you proceed under the rule and the district court says it's appropriate for interlocutory review. But there wasn't any saying about any motion, any egos. No, I don't think there was any for interlocutory review. I think the parties agreed with the district court about how to resolve and let those other claims that were separate. We don't let you split like that. That's why I asked if it was a final judgment. Judgment of all the claims in the case has not been resolved, right? That's correct. That's correct. So, I mean, there's Seventh Circuit law where the parties in front of the Seventh Circuit agree that those claims are gone. But other than that, I don't know that we have a final judgment. Well, I think I would have to speak to my clients before I could waive their claims. And maybe the best way to do that would be through a supplemental letter with the court after argument is over with. Going back to the matters at hand with the summary judgment, this was a case viewing the record in light most favorable to us where you have two officers who over the course of a year witnessed their superior officer become increasingly aggressive to both other officers and citizens alike. They repeatedly complained to their superiors, including Chief Caldwell, but nothing was done. And that was when another officer came to them and said that Lieutenant Roach had committed excessive force against Berkeley. So they reviewed the pictures of Berkeley, the showing marks on his body consistent with excessive force, and they heard from Lieutenant Roach himself bragging about mean and beating up Berkeley. So under those circumstances, Officer Krause said that he reported this to Captain Murray, who said he was going to report it on to the chief. But they harbored serious doubts about whether anything would be done, and they weren't the only ones. Officer Winder testified. I thought you went to Berkeley the next day after the incident. What's the question, Your Honor? I thought that the two officers went and gave the excessive force form to Mr. Berkeley the very next day. They did? After the incident. They did. After he had told Captain Murray about what had happened. Because they believed nothing would be done. Well, what I'm asking you is don't they, would it be too much to expect that they would at least give the internal processes of the department some time to operate? Or do you just jump the very next day after an incident and to doing something without bringing it up before whatever internal investigative mechanism exists within the department? Normally you would, but this wasn't a normal case because you had proven evidence he had brought. It just undercuts whatever internal investigatory mechanisms exist, doesn't it? Well, it did, but that's the case with all of these free speech cases. In Andrew, for example, when the officer spoke out about misconduct, it undermined a confidential investigation. And in Durham, much like this case, undermined the criminal investigation, and yet the court found that absent real proof of disruption, the First Amendment allows officers to do this because it serves as a curative rule and provides information that the public vitally needs. And here you had information that they were complaining about Lieutenant Roach, nothing was done. Officer Winder testified that the reason she left the police department, and I'm quoting here, was because they did not take serious complaints seriously. And then you have Chief Caldwell, who when asked whether or not the reason he never disciplined Lieutenant Roach was because Roach could expose his affair, he invokes his Fifth Amendment right over 40 times. So it's within that context that the court has to weigh the significance of the speech here versus any disruptive effect. And under Durham, this court has said that when speech involves serious police misconduct, it requires a greater showing of disruption. Normally when we've seen speech, it's maybe not in all cases, but generally it's been communication at a public meeting, a board of supervisors meeting or something, or a school board meeting or something, or a letter to an editor, or posting on, an online posting, or a conversation with a newspaper, or whatever, but it seems that most of our cases deal with that as speech, and it seems this is different. One might call it surreptitious conduct, but it's not the kind of speech that normally takes place in these sorts of circumstances, whether it's a police case or whether it's any other kind. Well, I'd have two responses to that, Your Honor. First is, they did speak to Berkeley. They told him, Lieutenant Roach has had problems in the past, but he's our superior officer. So we have officers that may support you, but you need to come forward first to file a complaint. And then if you have been abused, here's how you complain, and they handed him the form. But to your other point, this court's cases have never distinguished for First Amendment purposes between private and public speech, and I think we cite to those cases in our reply brief at page 12, that shouldn't matter for the First Amendment analysis here, and in some respects, the speech here was more targeted than if they had gone to the press as far as causing disruption within the police force. Going to the first problem... You don't think it's... Could you tell me other cases, because most of them that I've looked at have had a desire to amplify a speech in some kind of public forum. Either the speech has been delivered in a public forum, or as its aim, a larger public audience. And they did here as well, because they were exposing misconduct to Berkeley, the one person that could use it for the best purposes, and if he files a formal complaint, that probably would have exposed this even further. Okay, so where did you say that you cite all these cases where... I think that's in... I'm looking at page 11. I think it's page 12, with note 2, where the court says, it does not matter that speech was made privately rather than publicly, and we cite some cases there. And one of the first important factors in the First Amendment analysis here is the Garcetti analysis. Whether this speech was made outside their normal job duties. And we think it was. Chief Caldwell testified that no one in Moncks Corner Police Department handed out citizen's complaint forms, and that was not a part of their job duties. They also went out to Berkeley on their off time. The chief testified that when an officer has an unpaid lunch break, they were allowed to run personal errands, pick up kids from school. And there's no proof here that this had anything to do with the normal police duties of Moncks Corner Police Department. They were armed and they had a badge. That's correct, but they were still on their off time doing speech that was not within their normal job duties. If they had in this unmarked police car... Was there any doubt in Mr. Berkeley's mind that they were police officers? I'm not sure that that matters, Your Honor. Well, yes, it does matter as to whether they're speaking in the capacity as public officers or whether they're speaking as private citizens. They're handing out an official form that only public employees hand out. And there's no doubt Mr. Berkeley was not in any doubt as to the fact that they were police officers for one second because he thought the behavior exhibited so odd. He called up Officer Winder to recount the odd thing that had happened to him. He wouldn't have been on the phone or in communication with Officer Winder if he had been under any confusion about whether they were officers or not. Well, here are two responses as to why I don't think that's important. One, it's disputed. Officers Krause and Winningham said that they were going out there as citizens. What's disputed? Is it simply called Officer Winder? No, whether they were going out as citizens versus part of their normal job duties. Well, the underlying facts are not disputed. We know what they are. Yes, that's true. If these two officers had gone, did the same thing they did here, and gone in this car with their badge and guns on their off time, unpaid lunch break, and went and picked up their kids, no one would suggest that because they were in the car with their badges and guns, this was part of their normal job duties. This would get to the disruption part, but I really, to be honest with you, I don't know how a police department or any organization can function when you have employees running around behind the back of their supervisors trying to stir up litigation against their supervisors. I haven't seen a case, you know, quite like this. And when you get to the disruptiveness part of it, I can't understand how it could fail to be disruptive when you have subordinates, unbeknownst to the supervisor, running around, handing out forms, a prelude to litigation, not wanting the supervisor to know. And apparently an investigation later revealed that they never wanted him to know. I don't know. Did they wear gloves so that their fingerprints wouldn't be on the form? Well, it's clear here that this was not done perfectly, but the First Amendment doesn't require perfectly. But that's a euphemism to say that it wasn't done perfectly. They then wanted to cover the whole thing up. But they were not fired for that, Judge Wilkinson. What they were fired for was being disloyal for their speech, and that can be seen in a number of facts in the record. I don't think you can chop it up in that way. It was because they were fired only after the investigation by, I forget what the lieutenant's name was. Lieutenant Fields. And here's what Officer Krause said during his investigation to Lieutenant Fields. I agree this wasn't the smartest way to go about this. Corporal Winningham and I were frustrated with the way we were being treated by the lieutenant. This has been an ongoing problem for years, no matter who is under Lieutenant Roach. If that's the case, if they were frustrated by how they were being treated by the lieutenant, wasn't Chief Caldwell justified in regarding this, not as a matter of public concern but as a lack of personal chemistry or personal animus that three people in the department head toward one another? And Connick says that's not an issue of public import. It's a private squabble. And wasn't Chief Caldwell justified in regarding it as such? No, because here's the rest of the quote. I have written a rebuttal. I have made several complaints, and nothing had been done. If Mr. Berkeley was treated unfairly, I thought something needed to be done about it. This is consistent with what Officer Krause has said all along, that the disruption here was that Chief Caldwell did nothing about this lieutenant who was committing a series of misconduct, and everyone knew of it. He wasn't aware of it. That's disputed, Judge Wilkinson. It's disputed. My officers say that they made him aware. Officer Winder testified that she left because serious complaints were not taken seriously there. And I see my time is about up. Good afternoon. May it please the Court, my name is Chris Johnson, Lieutenant-at-Large Sabotson-Bennis in Columbia, South Carolina, and I'm pleased to be here on behalf of the town and Chief Caldwell. The Court seems to have a very good grasp of the facts, so I won't beleaguer those. I want to point out a couple of things. First of all, there is no evidence in the record that any of these concerns that the plaintiffs had ever got to the Chief. There is no testimony that they took any of this stuff to the Chief. Can I ask you this question? Yes, ma'am. I think I share some of Judge Wilkinson's unease here, but if the defendants had gone to the newspaper with all of these complaints about their colleague and the newspaper had printed it, would you be entitled to qualifying immunity? If they had gone to the newspaper and said that they were... This person has been treated unfairly, was beat up, or whatever. The problem is they didn't go to... I understand they didn't go to the newspaper. But let me lay the background. It's not that they didn't go to the newspaper. They didn't go to the suspect, to Berkeley, and say, you've been mistreated. They weren't there. I understand. They weren't at the arrest. Berkeley was. They didn't have to tell anyone. I understand. They go to the newspaper and they say, this person beats up people, and we know he beat up this particular witness. I think if they go to the newspaper without properly investigating facts based on third-hand rumors where they don't actually know anything, then I think we are entitled to qualified immunity. I think that's basically what Rickey v. Hall said, even though it was in the context of an election and not... Yeah, it was a whole different... Well, whatever this was, but the point is that, as Judge Wilkinson said, you've got to give the process a chance to work. The record shows that... That's why I was asking you. You didn't give the process a chance to work, but you do go make a public record of it, and you're... Let's also change it so that they're in their civilian clothes. Yeah, I don't know that going to the newspaper where they have you... That's a closer case, because there what you're doing is you're seeking an amplification of the speech, which is part of the speech, and which I think assists in making it more a matter of public interest. But there would be a big difference in contacting a newspaper and going behind your employer's back to stir up litigation against the supervisor in the department whom you don't get along with. I agree that that would be a closer case, Your Honor. I mean, I don't know any other way to answer it, because we just don't have those same facts right here. I think we'd have to... Well, you do have... They heard the admission of the rogue lieutenant as to what he did. Right? Can you speak up just a little bit? We do have in the record that they participated with or heard the rogue lieutenant's admission as to what he did. We have in the record that they say that the lieutenant basically told them that he had to take down a 6'5 man over the weekend. We have that, yes. But we don't have evidence that they knew sort of blow by blow what it was that happened. And regardless of what they know on that point, to then go out to the suspect's house surreptitiously in secret, tell him, you know, don't tell anybody we were here. If you do go, complain. Don't, you know, pretend like you don't know us. These are all things that the suspect reported to Lieutenant Fields. And what's important for the purpose of qualified immunity is to understand that you've got to look at the facts that the chief had at the time he made the decision. And there's no dispute as to what those facts were. We have the transcript in the record of what the suspect told Lieutenant Fields who went to do the investigation. We have the transcript or the audio recordings in the record of what Officer Winningham and Krause, the plaintiffs, told Lieutenant Fields. It's all in the record, is it not? Yes, yes, Your Honor, it is. So we know what information the chief had. There's not a dispute as to that. And Judge Wilkinson earlier made the point that we've never seen a case quite like this. I think Masciarello v. Sumner is about as close a case as you're going to get to it. In that case, which was decided in 1992, you had, again, two officers who go off on some informal investigation based on their belief that there had been evidence tampering. And when they were caught, they were demoted, they resigned, and they challenged their demotion. And what the court said there was that you can't countenance, just like Judge Wilkinson said, you can't countenance these informal investigations in a police organization, in a paramilitary organization where discipline is demanded and freedom is correspondingly restricted. So I think we have seen that case. I wanted also to briefly touch on the fact that was raised earlier. I believe it was that my colleague said that when the chief was asked about the disruption to the department, he pled the Fifth Amendment. That's absolutely untrue. Where he pled the Fifth Amendment in his deposition was when he was asked repeatedly about whether he committed adultery, which had nothing to do with this case. And when we moved for a protective order to terminate any questions as to that, we were granted that order. So that's not part of this at all. The opposing counsel indicated that although the Chief Caldwell knew about some of these other incidents at a reunion party or with his brother-in-law, I forget what some of them were, that it was disputed whether he knew about them or not. You made a statement that he didn't know anything about some of these things. On one, he had exonerated the lieutenant, but some of the others he was not aware of? That's correct, Your Honor. There were three incidents in the record. One had to do with a high school reunion. One had to do with an interaction with Plaintiff Winningham. And the third was an interaction that he had with his brother. And of the three incidences, the Chief testified that he was not aware of the high school reunion or the incident with Winningham until he heard about it in discovery in this case. And there's no evidence in the record that Winningham took his issue to the Chief or that either of them took any of these issues to the Chief, including the third one with the brother that he did know about because Lieutenant Roach self-reported it. And in that case, the Chief did say that in essence this guy's brother has special needs and he lives with his sister and the sister was having trouble getting him to take a bath and clean his room, I believe was the testimony. So she said, hey, I need help with my brother. And he went over there and he helped and they apparently came to blows, which is unfortunate, but the Chief didn't feel like that called into question his ability to be a police officer. And the fact remains that there's no evidence in the record that either plaintiff claims that they took any concerns they had about that issue to the Chief. So can we just go down what they would have to do to show a First Amendment violation? One, they would have to speak as private citizens. Correct. Rather than in their official capacity. Right. So do you dispute that? Do I dispute that they were speaking as private citizens rather than in their official capacity? I would think you would acknowledge that. That's part of your deal, that they were going out on a toot on their own. I mean, yeah, I certainly see where you're going with this. They were certainly, let me put it this way, they were certainly not supposed to go out there. They certainly took the imprimatur of their office with them when they showed up with badges and guns. And handed out official forms. And handed out official forms and talked about matters that, you know, a criminal matter that their office was grasped up in. Well, it's just in the record that these forms are at the office. You can ask anybody for the forms. I'm really not a proponent for one thing or the other. I'm just trying to understand where the rub is here. And it doesn't seem to me that the rub is with respect to whether they act as private citizens. But if you tell me yes, you don't think they were. That they were acting as police officers there. You know, they showed up. I understand what the facts are, just give me an answer to my question. Well, I would think that they did show up as police officers. Okay, so you don't think they acted as private. You have to do this against all of the case law on qualified immunity. And you know that because this is your case, right? And so you know that fitting it into that case law, they didn't act as private citizens. I understand that. I don't know that we have to wrestle with that for very long in order to... Well, that's what I was trying to get you on to the other issues. You wanted to be arguing. I don't know that this one's dispositive, is what I'm trying to say. And you would concede that this is a matter of public concern. I would concede that police misconduct is a matter of public concern. And if that's what they're talking about, then that may be a matter of public concern. But again, the record, what the chief knew, was what they told Lieutenant Fields and what Lieutenant Fields told the chief. And what they said, what they both said was that they went and did this because they were tired of working under Lieutenant Brooks. Not because they wanted to blow the lid on any sort of police misconduct, but because they were tired of working for the lieutenant. But, and I think that's a fair point, but they were tired of working for him because he beat up people. That's not in the record, Your Honor. They just said they're tired of working for him. And that's the only thing they said. Their statement is, we went there because we were tired of working for him. The end. Well, I mean, not in those words, but yes. Your colleague is going to get up in a minute. Well, and he can read from the record, but what they both said... So what did they say in addition to that? Well, we have the... I don't have the record in front of me. I can go and get it. No, you can characterize it. I'm happy with your characterization. Well, the characterization... Give me a full characterization. Well, the characterization is that they both told him... Neither one of them... Here's the thing. Neither one of them raised any concern that they had to the chief. And they didn't raise any concern that they had to the lieutenant. All you've got is the one straight statement where one of them says, well, look, if this guy was mistreated, then he was entitled to complain. Well, of course he was. But the question isn't, you know, what was actually in their minds. The question is, what did the chief know based on what he was told? I mean, he had Lieutenant Fields go out and do this investigation, and what they tell Lieutenant Fields is that the reason they did it, they admit it was stupid, they admit it was the wrong thing to do, and what they tell him is that they're tired of the way that they've been treated by Lieutenant Roach. And neither of them says, we're getting beat up by Lieutenant Roach or that he's beating up other people. They say, we don't like the way he treats us. So the person to whom they're telling this... Yes. Does he have any obligation to do any investigation then? Well, he was investigating it. But I thought you kept telling me this is all he knows. All he knows is what they tell him. All the chief, the decision-maker knows is what... Right, chief. So is he required to do anything once he gets this information? Or can he just say, that's all I know. Well, he's already sent someone out. I mean, he's already had Lieutenant Fields talk with the plaintiffs. So he does know something more. Well, he knows exactly what... Again, he knows exactly what... Lieutenant Fields' testimony was that he took the information that he got from the plaintiffs, that he got from interviewing Officer Weiner, that he got from interviewing the criminal suspect. I think he may have interviewed a couple of other people who's not really relevant at this point. But he took all that information, and he took that to the chief. So the chief had an investigation... And none of that suggested that this was anything... They were worried about police brutality. No. All it suggested was that they had basically gone rogue and conducted their own investigation into their supervisor for their own personal reasons. I know that's how you characterize it, and certainly I think there's stuff in the record to support that. But I just want to try to tease out that there is... Because I had thought there was, but I may be mistaken, that there was also evidence in front of him that they were worried about these fellow officers' treatment of suspects and brutality to them. But if you tell me that's not, I take your word. Yeah, I don't believe there's anything in the record that indicates that that was in front of the chief at the time. But if that had been in front of the chief, you would agree that that's a matter of public concern? Certainly, if there's any significant evidence of it. Well, if there's any evidence... I mean, our case law is like a volume about that. But there's a difference between... I mean, you look at some of the cases that they're talking about, for example, where you've got an individual who was basically told by a couple of sergeants in investigations that, look, we're going to press charges against you if you don't revise a statement you made because we're afraid of litigation because of the way you took this guy down. That's certainly a huge, serious thing. If you've got a fatal shooting, I believe that one's in Durham v. Jones, where you've got a commander who's on scene and says, I don't think you had to shoot the guy. That's a big deal. Where you're talking about a police officer who, at a high school reunion, gets into a scuffle with a guy who touched a girl wrong, that's a different thing altogether. That's not the same level of facts as we have in the cases that we've had before this court. Or where he went to help his sister with a domestic issue, or where he got into a disagreement with Plaintiff Winningham over who was going to escort somebody around the town. These are things that... Could he have regarded this whole business, could the chief have regarded this whole business as a private disagreement and two people, two police officers who didn't at all get along with Lt. Roark, who was their supervisor. So you've got, as you often have, personal disagreements, poor personal chemistry, personal animosity within the department. Was it legitimate to regard that as... That's, when boiled down to its essence, that's what this was about. Yes, Your Honor. Yes. I'm about to run out of time, and I don't know if the court has any other questions. I wanted to touch briefly on the Monell issue because that's in the briefs. I know my colleague didn't have time to argue it when he was up here, but basically they rest their case on that, assuming that there is a violation of the First Amendment at all, which we obviously dispute vigorously, on their contention that Chief Caldwell is a final policymaker for personnel matters for the town. And clearly he is not. The cases in the Supreme Court and in this court have said that state law is what controls. In this case, the state statutes provide that the mayor and council have, basically, that the council in a town has plenary power. The report that Lieutenant Thiel submitted to Chief Caldwell covered the fact that they intended to cover up this conduct. Yes. And that they intended to misrepresent and lie about what had happened. Yes, Your Honor. That was part of the report that was submitted to Chief Caldwell that not only was the form handed out and everything, but that they wanted to misrepresent and lie about what had happened and cover up what they were doing. Yes, Your Honor, that is correct. That's in the report. That is in the report. It's in the written report. The written report wasn't made until later. But it was that written report which was the basis on which the chief had acted. It was the information that's in that report. That is correct. He didn't have the written report yet, but he did have... But he had the information that was in the written report. He did not act until he had the information that was in the written report. Yes, Your Honor, that is correct. What form was the information in? Lieutenant Fields was telling him as he interviewed folks what information he got from them. Okay, and it was all summarized in the written report? Yes, Your Honor. Yes, Your Honor. I see I'm about out of time. If the court doesn't have any other questions, I don't have anything else. Okay, thank you. Thank you, and may it please the court. Judge Monst, I have heard from co-counsel that the district court allowed them to file two separate cases, and we're going to address it in a 28-J letter. We can do that. But I think what happened was those two claims were supposed to be dismissed in this case, and they were filed in separate action terms being held by the district court there. So I'll address that in a 28-J. Let me ask you one other thing, Mr. Hopwood. At the very least, from the questions we've been asking and the discussion, the very useful discussion we've had, at the very least, wasn't the chief entitled here to qualified immunity? I mean, there's no slam-dunk issue on this. I mean, how could it possibly be said in light of the precedents that he was acting in violation of clearly established law? It was certainly a reasonable perception on his part that officers were going behind his back, trying to stir up litigation against a supervisor whom they did not get along with, and they wanted him out. And after that, they were going to cover up what they'd done and lie about what they'd done. Now, the chief looks at this. He says, this is a threat. The way I perceive these and the way this investigation has unfolded the facts to me, this is a threat to my very ability to operate this department. And it erodes any kind of authority that I might hope and that lieutenants under my command might hope to assert. And you're not even going to give him qualified immunity for that kind of judgment? That's a violation of clearly established law? How can that be? Judge Wilkinson, the only way the chief's entitled to qualified immunity here is if you commit the same error as the district court, because everything in this record is disputed. What he knew, Officers Krauss,  there is a whole bunch of evidence that Krauss was telling him about this misconduct with Lieutenant Roach and he knew nothing about it. There is evidence... What do you mean he was telling him and he knew nothing about it? Excuse me, that he was telling him and the chief did nothing about it. All of these facts are disputed. Their motive in the case for why they spoke was disputed. It's not disputed. It's not disputed that they went to Berkeley the very day after the incident that it was very clear, they knew it was very clear that Berkeley knew they were acting as police officers, that they were distributing to someone an official form as a prelude to litigation, that they were trying to cover it up, that they were going to lie about it, that they were going to take steps to cover it up. Those kinds of things were not disputed. No, but it was disputed what he knew. It was disputed what the motive was here. I read you the statement of Officer Krause that was in that report that the chief had and you can read that and apply it in our favor and see that he's saying the same things he's been saying all along. I told you about this guy. You did nothing and because it happened again, I went out and did something. And I think that the court's reluctance here is we don't want to sanction this. About something that happened at a reunion? No, about all of these incidents. I mean, this wasn't just a one-time incident. Officer Winder said that the reason she left was because serious complaints weren't taken seriously. You had a series of events with Lieutenant Roach. This was a small police department. Everyone knew. And I'm not sitting here saying that every case like this has to be protected speech. If this chief would have put some evidence, as this court cases say, on the record about disruption, I wouldn't be up here arguing this. But that's not what happened here. He cannot just come in and say disruption when a speech involves serious police misconduct. That's what Andrew and Durham said. Andrew and Durham also in Hunter, this idea that matters whether it was to the news media or to the criminal defendant, was rejected in Hunter  You can always gin up disputed issue of fact about the internal personality conflicts and the internal workings of a police department. Some of them work well, others are snake pits. But if all of these kind of disputes go to trial, then there's nothing left to qualify as immunity. You've simply eviscerated the way the Supreme Court wished that kind of speech to operate. If there were a more serious litany of incidents against this officer, well, OK. But as your opposing counsel pointed out, you just don't have the record of serious abuse. You have conclusory statements, but we don't have the number of investigations, we don't have the kind of incidents. It's stuff about people having affairs and people at reunions and things. And you say it's serious police misconduct, but I don't think the record really bears that out. Well, the record showed that several officers that were there thought it was excessive force. There were pictures of excessive force. Lieutenant Roach admitted to needing Berkeley after he was in handcuffs. That, to me, is speech about serious police misconduct. And I take it your point about the qualified immunity, but Toland said you have to factor in these disputes before you decide qualified immunity. That was the exact error that the district court made. And as far as Monell, state law, my opponent is correct, state law decides this. State law allocated all the executive decision-making to the mayor. He then delegated it to the chief, and no one reviewed the chief's decision. So when the chief spoke on personnel matters, he did so on the town. How can he view this as anything else than, at least within the bounds of reason, in seeing these unfolding events, which they were designed to conceal from him and operate behind his back, he could at least reasonably, within the bounds of a reasonable judgment, say this is a threat to how I can operate this department. And if I don't act to put a stop to this, then whatever semblance of authority and efficiency can be asserted here is going to be seriously eroded. But that's not what the record shows, Your Honor. The record shows he fired them for disloyalty. The record shows that he put no evidence in about disruption. If he had, this would be a much different case. But when there's serious police misconduct, he has to put in something about disruption. And the biggest disruption here was Lieutenant Roach and the chief not doing anything about it. And with that, if there's no further questions, thank you, Your Honors. We thank you very much. We'll adjourn court and come down and greet counsel.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Henry F. Floyd